1

2

3

4

5          UNITED STATES DISTRICT COURT

6          EASTERN DISTRICT OF CALIFORNIA

7

8   MIKE E. BARBA, BARBRA BARBA, and          CASE NO. 1:12-CV-00195 AWI JLT
    TYE BARBA,
9
              Plaintiffs                       ORDER ON DEFENDANTS' MOTION
10                                             FOR SUMMARY JUDGMENT
              v.
11                                             (Doc. No. 43)
    CITY OF SHAFTER, RANDY
12  MILLIGAN, JOSHUA STEPHENS, and
    DOES 1 through 20,
13
              Defendants
14

15

16         This case stems from a police encounter between Plaintiff Mike E. Barba ("Barba") and

17  two police officers from the City of Shafter ("the City"), Defendants Randy Milligan ("Milligan")

18  and Joshua Stephens ("Stephens").  The Complaint alleges nine causes of action, including claims

19  under 42 U.S.C. § 1983 for violation of the Fourth and Fourteenth Amendments, and claims under

20  California law for false arrest, battery, loss of consortium, and intentional and negligent infliction

21  of emotional distress.  Defendants now move for summary judgment.  For the reasons that follow,

22  Defendants' motion will be granted in part and denied in part.

23

24                      SUMMARY JUDGMENT FRAMEWORK

25         Summary judgment is proper when it is demonstrated that there exists no genuine issue as

26  to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.

27  Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-

28  Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears

the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. Soremekun, 509 F.3d at 984. Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. See James River Ins. Co. v. Herbert Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984. If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103. The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

The opposing party's evidence is to be believed, and all justifiable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899

(9th Cir. 2010).  While a "justifiable inference" need not be the most likely or the most persuasive inference, a "justifiable inference" must still be rational or reasonable.  See Narayan, 616 F.3d at 899.  "If conflicting inferences may be drawn from the facts, the case must go to the jury."  Holly D. v. Cal. Inst. of Tech., 339 F.3d 1158, 1175 (9th Cir. 2003).  Inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  The parties have the obligation to particularly identify material facts, and the court is not required to scour the record in search of a genuine disputed material fact.  Simmons v. Navajo Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010).  Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'"  Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment.  Nissan Fire, 210 F.3d at 1103.

## **FACTUAL BACKGROUND**[1]

During the evening of February 7, 2011, Barba had a strange telephone conversation with his wife in which he did not "make a lot of sense" and made statements such as "I am going to die tonight."  See Barbra Barba Depo. 32:2-24.  Barba's adult son Tye Barba ("Tye") called Barba, and also had a strange conversation in which Barba was mostly silent, but did say things like "they're going to get me," and "I'm not going to see you again."  See Tye Depo. 16:-17:12.  Barba's family contacted the Kern County's Sheriff's Department, and the Sheriff's Department contacted the City Police Department.  See Erin Barba Depo. 27:11-20; Defendants' Ex. 3.

---

[1] "DUMF" refers to Defendants' Undisputed Material Fact, "PRDUMF" refers to Plaintiffs' Response to Defendants' Undisputed Material Fact, "PUMF" refers to Plaintiffs' Undisputed Material Fact.

City police officers Milligan and Stephens then received a "be on the lookout" alert from dispatch.  See id.; see also DUMF 1.  The alert identified the subject as Mike Barba, gave a physical description of Barba, described the vehicle Barba was in, and identified a possible location for Barba based on a cell phone hit off of a particular cell tower.  See id.  Dispatch informed the officers that Barba was a "possibly suicidal subject" who was "making suicidal threats over the phone."  DUMF 1.

Tye and his wife found Barba's truck in an oil drilling site outside the City.  See Stephens Depo. 26:1-8; Tye Depo. 26:3-9.  Tye approached Barba, who was sweating and "leaned forward" on the steering wheel.  See id. at 26:14-21.  Barba was not responsive to Tye or to a drill site manager who Tye had contacted.  See id. at 33:5-21.  Tye's wife notified officials where Barba was located and asked for an ambulance.  See Erin Barba Depo. 27:11-25.

Milligan and Stephens arrived at the oil drilling cite around 3 a.m.  See DUMF 2; Stephens Depo. 26:1-12.  The windows in Barba's truck were fogged, see Milligan Depo. 40:9-12, the truck was not running, see Doc. No. 48-1 at Defendants Response in Support of DUMF 2, and Barba looked sweaty and leaned forward onto the steering wheel.  See Tye Barba Depo. 26:14-20.

Stephens used the PA system on his police cruiser to issue verbal commands to Barba to get out of the truck.  See Stephens Depo. 74:12-25;[2] Milligan 49:6-10.  After about three verbal requests to exit, Barba finally came out of his truck.  See DUMF 3.  Barba got out of the truck very slowly.  See Milligan Depo. 50:5-6.  Stephens ordered Barba over the PA system to turn around (so that Barba's back would be facing the officers), interlace his fingers behind his head, and walk backwards toward the officers.  See Stephens Depo. 77:5-78:1.  Barba initially did not comply with Stephens's commands, but after giving the orders three or four more times, Barba began to comply and walked backwards toward the officers.[3]  See id. at 78:2-18.  While

---

[2] Stephens testified that he ordered Barba to turn off the truck.  However, the truck was not running.  See Doc. No. 48-1 at Defendants Response in Support of DUMF 2.

[3] Milligan contends that Stephens ordered Barba to close the truck door and lift up his shirt, but that Barba refused to do so.  See DUMF 4.  Citing Stephens's deposition, Plaintiffs dispute that Stephens gave such orders.  A review of Stephens's deposition does not indicate that he gave Barba these orders.  See Stephens Depo. 74-78.  On summary judgment, the non-moving party's evidence is credited and the evidence is viewed in the light most favorable to the non-moving party.  See Narayan v. EGL, Inc., 660 F.3d 895, 899 (9th Cir. 2010).  So viewing the evidence, DUMF 4 is not established.

4

1   commands were given to Barba, he had a bizarre look on his face, almost like a grin or a smirk, as

2   if he was annoyed or bothered.  See Milligan Depo. 55:5-10.

3         As Barba began walking backwards, Stephens dropped the PA microphone, moved

4   towards Barba, and let Milligan give Barba all further instructions.  See Stephens Depo. 79:23-

5   80:10.  Barba walked very slowly backwards toward the officers, almost trudging.  See Tye Depo.

6   43:14-20.  When Barba began moving backwards, Stephens noticed nothing suspicious about

7   Barba's movements, did not see Barba make any furtive gestures, and has no recollection of Barba

8   ever lowering his hands.[4]  See Stephens Depo. 78:19-25, 100:20-22, 140:21-141:5.

9         When Barba was about 8 feet from the officers, he was instructed to turn around slowly.

10  See Tye Depo. 45:5-15.  Barba was on very uneven terrain.  See id. at 45:21-24.  Barba began to

11  turn around "really slowly."  Id. at 45:11-12.  As Barba was turning, he stumbled or tripped.  See

12  id. at 45:17-25.  Tye explained that it looked like Barba "had stumbled a little bit or like he was

13  just jolting."  Id. at 45:24-25.  As Barba stumbled, he was facing more in the direction of the

14  officers' vehicle and not in the direction of his truck.  See id. at 46:4-24.  The officers said "sir, sir,

15  stop," they started yelling at Barba, and then Milligan shot Barba with a taser.  See id. at 46:1-3.

16  Tye did not hear either officer say "stop or we'll tase you," or anything with the word "taser" in it,

17  but Stephens testified that he heard Milligan say "taser, taser, taser" just before Milligan shot

18  Barba.[5]  See Tye Depo. 48:13-16; Stephens Depo. 84:14-23.  Milligan was between and 10 and 20

19  feet away from Barba when he deployed the taser.  See Stephens Depo. 85:2-11.

20        The taser caused Barba to fall forward and on his side, and he ultimately came to rest on

21  his stomach.  See Milligan Depo. 65:16-66:7; Tye Depo. 48:17-49:9.  The officers approached,

22

23  [4] Milligan contends that Barba would lower one arm to his side and on three occasions shuffled his feet as if he was
    going to run back to his truck.  See DUMF's 5, 6.  Plaintiffs dispute this testimony and rely on the testimony of

24  Stephens and Tye.  Although Stephens testified that he was "primarily focused" on the passenger side of the truck,
    Stephens also testified that he observed no furtive or suspicious movements, he did not recall ever seeing Barba's arm

25  dropped, and he did not observe Barba make any "shuffling" movements.  Tye testified that he observed Barba
    walking backwards, and then Barba stumbled.  Tye did not indicate that Barba was shuffling his feet.  Viewing the

26  evidence in the light most favorable to Plaintiffs, see Narayan, 660 F.3d at 899, DUMF's 5 and 6 are not established.

27  [5] Milligan's version of events is different from Tye's version.  Milligan contends that he warned Barba not to do the
    "shuffling" motion or else a taser would be used; Barba did the "shuffling" move but instead of stopping, Barba

28  charged towards his truck and began to run; and Milligan ran after Barba a short distance before deploying the taser.
    See Milligan Depo. 62:9-64:17.  Because Plaintiffs are the non-moving parties, their version of events, and not
    Milligan's, is credited for purposes of this motion.  See Narayan, 660 F.3d at 899.

and Stephens began to handcuff Barba.  See Stephens Depo. 90:1-19, 94:20-25; see also Milligan

Depo. 71:20-25.  Stephens placed his knee on Barba's upper thigh, and was able to handcuff

Barba's left wrist.  See id. at 90:1-91:2, 94:13-95:7.  However, Barba's right wrist was under his

body, and Stephens made three attempts to pry Barba's wrist out from underneath Barba.  See id.

at 90:1-91:22.  Barba made no movements while Stephens was attempting to pry the right wrist

free and into the handcuffs, but Barba was clutching his right hand underneath him.  See Stephens

Depo. 90:1-91:14.  Without additional warning, Milligan cycled the taser a second time.  See

PUMF 14; Milligan Depo. 71:9-12; Stephens 93:9-19.  Stephens was then able to gain control of

Barba's right wrist and placed both of Barba's hands in handcuffs.[6]  See Milligan Depo. 71:1-4.

Stephens estimated that from the time he got the first handcuff on, to the time that he got the

second handcuff on, between 7 and 9 seconds elapsed.  See Stephens Depo. 91:23-25.

Both officers then picked up Barba and carried him underneath his arms (one officer on

either side of Barba) with his feet dragging to a police vehicle.  See Tye Depo. 51:1-25.  Fire

Department personnel had been summoned and assessed Barba's blood pressure and pulse.  See

Milligan Depo. 91:3-17; Stephens115:25-117:13.  Milligan told Tye that he had tased Barba

because it "looked like [Barba] was going to try to run."  Tye Depo. 62:18-20.  During the entire

encounter with the officers, Barba was silent and said nothing to anyone.  See PUMF 15.

After taking Barba to the City police station, and later consulting with Barba's wife,

Stephens admitted Barba to a hospital for psychiatric assessment and treatment under California

Welfare & Institutions Code § 5150.  See Stephens Depo. 118:6-121:7, 130:9-131:25.

## DEFENDANTS' MOTION

### A.      Fourth Amendment -- Excessive Force

#### Defendants' Argument

The officers argue that the undisputed facts demonstrate that no excessive force occurred.

---

[6] Milligan's version of events is different from Stephens's version.  As indicated above, Stephens testified that Barba made no movements after he was tased.  In contrast, Milligan testified that Barba kicked his legs and knees up as if he were going to get up and also was pulling the arm that Stephens had ahold of.  See Milligan Depo. 68:2-21. Because the evidence is viewed in the light most favorable to the non-moving party, Stephens's version of events, and not Milligan's version, is credited.  See Narayan, 660 F.3d at 899.

The officers were informed of a suicidal individual who was making suicidal threats, Barba was found largely nonresponsive in an isolated oil field, Barba refused to comply with instructions, later lunged towards his truck, and ignored a warning that he would be tased.  The officers did not know what weapons may have been either on Barba or in the truck, and Milligan had to make a split second determination in using the taser.  Further, after Barba was momentarily disabled from the first taser application, he attempted to get up and refused to produce one of his hands for cuffing, which necessitated the second use of the taser.  Finally, Barba bears the lion share of responsibility for what occurred.  It was Barba who acted in a bizarre fashion, who failed to comply with lawful orders, and who failed to cooperate with being handcuffed.  Under the totality of the circumstances, the officers' actions were objectively reasonable.

Alternatively, the officers argue that they are entitled to qualified immunity.  Settled law on taser use was not set by the Ninth Circuit until October 2011.  Even if the use of the taser was excessive, the law was not sufficiently settled to put the officers on notice.  Given the uncertain state of the law with respect to tasers, and the circumstances surrounding the incident, a reasonable officer could have concluded that acts of Milligan and Stephens were not unconstitutional.

*Plaintiffs' Opposition*

Plaintiffs argue that Defendants' motion relies almost entirely on Milligan's testimony. However, the testimony of Stephens and Tye show that there are many material disputed facts. The quantum of force used was two taser applications, but the governmental interest at stake was low.  Barba was not committing any crime, and he was not a threat to the officers or to anyone else, rather he was docile, uncommunicative, and suffering some form of mental condition.  Barba did not try to evade arrest, and was not actively resisting arrest.  Finally, contrary to Milligan's testimony, Barba was not running back towards his truck and no split second decisions were required.  Under these circumstances, use of the taser was not reasonable.

*Legal Standards*

1.   Excessive Force

All claims that law enforcement officers used excessive force, either deadly or non-deadly, in the course of an arrest, investigatory stop, or other seizure of a citizen are to be analyzed under

the Fourth Amendment and its standard of objective reasonableness.  See Scott v. Harris, 550 U.S. 372, 381-83 (2007); Graham v. Connor, 490 U.S. 386, 395 (1989).  Cases that involve deadly force do not fit into their own separate category with their own set of "rigid pre-conditions" that must be met, rather the key is whether the officer's actions were reasonable.  See Scott, 550 U.S. at 382-83; Price v. Sery, 513 F.3d 962, 968 (9th Cir. 2008).  The pertinent question in excessive force cases is whether the use of force was "objectively reasonable in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." Graham, 490 U.S. at 397; Blankenhorn v. City of Orange, 485 F.3d 463, 477 (9th Cir. 2007).  The objective inquiry into reasonableness is highly fact specific.  See Scott, 550 U.S. at 383; Wilkinson v. Torres, 610 F.3d 546, 551 (9th Cir. 2010).  "We first assess the quantum of force used to arrest [the plaintiff]" and then "measure the governmental interests at stake by evaluating a range of factors."  Davis v. City of Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007).  Factors that are considered in assessing the government interests at stake include, but are not limited to, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396; Luchtel v. Hagemann, 623 F.3d 975, 980 (9th Cir. 2010); Davis, 478 F.3d at 1054.  Where it is or should be apparent that an individual is emotionally or mentally unstable, that is a factor that must be considered in determining the reasonableness of the force employed.  See Luchtel, 623 F.3d at 980; Drummund v. City of Anaheim, 343 F.3d 1052, 1058 (9th Cir. 2003).  Courts also are to consider whether it was feasible to give a warning before using force, and whether a warning was actually given.  See Bryan v. MacPherson, 630 F.3d 805, 831 (9th Cir. 2010).  "In some cases . . ., the availability of alternative methods of capturing or subduing a suspect may be a factor to consider."  Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005); see Luchtel, 623 F.3d at 980.  However, police officers "are not required to use the least intrusive degree of force possible" as long as the force actually used was reasonable. Forrester v. City of San Diego, 25 F.3d 804, 807 (9th Cir. 1994); see Gregory v. County of Maui, 523 F.3d 1103, 1107 (9th Cir. 2008).  That is, a reasonable use of force "encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable."

1  Wilkinson, 610 F.3d at 551.  It may also be appropriate to consider the parties "'relative

2  culpability,' i.e. which party created the dangerous situation and which party is more innocent,

3  may also be considered." Espinosa v. City & County of San Francisco, 598 F.3d 528, 537 (9th

4  Cir. 2010); see Scott, 550 U.S. at 384.  Reasonableness "must be judged from the perspective of a

5  reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S.

6  at 396; Wilkinson, 610 F.3d at 550.  "The calculus of reasonableness must embody allowance for

7  the fact that police officers are often forced to make split-second judgments – in circumstances

8  that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a

9  particular situation." Graham, 490 U.S. at 396-97; Wilkinson, 610 F.3d at 550.  Since "[n]ot every

10  push or shove, even if it may seem unnecessary in the peace of the judge's chambers, . . . violates

11  the Fourth Amendment," Graham, 490 U.S. at 396, "[n]either tackling nor punching a suspect to

12  make an arrest necessarily constitutes excessive force." Blankenhorn, 485 F.3d at 477.  "Force is

13  excessive when it is greater than is reasonable under the circumstances." Santos v. Gates, 287

14  F.3d 846, 854 (9th Cir. 2002).

15       2.    Qualified Immunity

16       A court employs a tiered analysis for determining qualified immunity.  See Saucier v.

17  Katz, 533 U.S. 194, 200-02 (2001); CarePartners LLC v. Lashway, 545 F.3d 867, 876 n.6 (9th Cir.

18  2008).  However, lower courts need not strictly follow the tiered sequence in analyzing qualified

19  immunity, but instead have the discretion to dispose of the issue at step two without addressing

20  step one. Pearson v. Callahan, 555 U.S. 223, 236 (2009); Glenn v. Washington County, 673 F.3d

21  864, 870 (9th Cir. 2011).  Under the first step, the court determines whether, "taken in the light

22  most favorable to the party asserting the injury, do the facts show the officer's conduct violated a

23  constitutional right?" Saucier, 533 U.S. at 201; Bingue v. Prunchak, 512 F.3d 1169, 1173 (9th

24  Cir. 2008).  All factual disputes are resolved in favor of the party asserting the injury.  See Saucier,

25  533 U.S. at 201; Ellins v. City of Sierra Madre, 710 F.3d 1049, 1064 (9th Cir. 2013).  If the

26  answer to the question is "no," then the inquiry ends and the plaintiff cannot prevail; if the answer

27  is "yes," the court continues the analysis.  See Saucier, 533 U.S. at 201; Bingue, 512 F.3d at 1173;

28  Johnson v. County of L.A., 340 F.3d 787, 793-94 (9th Cir. 2003).  Under the second step, the

1   court determines "whether the right was clearly established," and applies an "objective but

2   fact-specific inquiry."  Inouye v. Kemna, 504 F.3d 705, 712 (9th Cir. 2007); see Saucier, 533 U.S.

3   at 202.  The critical question is whether "the contours of the right were sufficiently clear that a

4   reasonable official would understand that what he is doing violates the right."  Saucier, 533 U.S. at

5   202; Inouye, 504 F.3d at 712.  Whether a right is clearly established must be "undertaken in light

6   of the specific context of the case, not as a broad general proposition."  Saucier, 533 U.S. at 201;

7   Bingue, 512 F.3d at 1173.  If the officer could have reasonably, but mistakenly, believed that his

8   conduct did not violate a clearly established constitutional right, then the officer will receive

9   qualified immunity.  See Saucier, 533 U.S. at 205-06; Johnson, 340 F.3d at 794.

10      *Discussion*

11      1.      Constitutional Violation

12      The quantum of force at issue is two taser cycles from a taser that was used in dart mode.

13   In dart mode, a pair of metal barbed probes that are connected to wires are propelled/shot towards

14   an individual.  See Bryan v. MacPherson, 630 F.3d 805, 825 (9th Cir. 2010).  When the probes hit

15   and attach into a person, an electrical charge is delivered into the person's muscles through the

16   wires and probes, which causes paralyses.  See id.  A taser in dart mode is considered an

17   intermediate or medium, though not insignificant, quantum of force.  See Mattos v. Agarano, 661

18   F.3d 433, 449 (9th Cir. 2011); Bryan v. MacPherson, 630 F.3d 805, 825-26 (9th Cir. 2010).

19      Here, the taser was fired once, but cycled twice.  The Court will examine the two taser

20   cycles separately.  See Sanders, 551 F.Supp.2d at 1167.

21              a.      First Taser Cycle

22       The officers do not argue that Barba was violating any provision of the Penal Code.  The

23   officers were at an oil drilling site investigating a possible suicidal man.  Barba's behavior was

24   severely abnormal and it appeared that he needed help.  Barba was sweating, hunched over,

25   verbally unresponsive, slow to react, and he was physically responded only after multiple

26   commands were given over a PA system.  Barba's conduct reasonably implicated Welfare &

27   Institutions Code § 5150, which permits a peace officer to detain and admit an individual to a

28   mental health facility for 72 hours if the individual is a threat to himself.  See Cal. Wel. & Inst.

1  Code § 5150(a).  There is an important governmental interest in attempting to get an individual

2  medical attention who appears to be a risk to himself due to a mental disorder.  But, "the use of

3  force that may be justified by that interest [i.e. the interest to provide psychiatric help] necessarily

4  differs both in degree and in kind from the use of force that would be justified against a person

5  who has committed a crime or who poses a threat to the community."  Bryan, 630 F.3d at 829.

6         When Milligan fired the taser, Barba was not an immediate threat to the officers or to

7  others.  Barba was in the process of complying with the officers' commands and slowly walking

8  backwards toward the officers with his hands on his head.  Barba was less than 10 feet away from

9  the officers when he stumbled, and he did not stumble toward his truck.  Barba did not appear to

10  be armed, was not charging the officers, and made no furtive or suspicious movements or gestures

11  of any kind.  There is no testimony that the stumbling action was perceived as hostile or that it

12  could have been reasonably perceived as hostile.

13         Barba was not actively resisting arrest or attempting to evade arrest.  Barba was complying

14  with the officers' commands, albeit very slowly.  Barba did stumble, but merely stumbling is

15  hardly resistive behavior.  Tye's testimony shows that Barba did not run and was not attempting to

16  evade or get back to his truck.

17         Barba appeared to be emotionally unstable.  See Drummond, 343 F.3d at 1058.  As

18  described above, Barba said nothing during the entire encounter with the officers, was extremely

19  slow to respond, and was reported to be suicidal.

20         No warning was given to Barba.  Although Stephens said he heard Milligan say "taser"

21  three times, Tye did not.  Assuming that Milligan did say "taser" three times, that is not

22  necessarily the same as warning someone that a taser will actually be used against them.  Further,

23  Barba's stumbling appears to have been the event that triggered the use of the taser.  Stumbling is

24  not resisting or fleeing, and it is an action that generally does not last long.  It is unknown why a

25  warning to the effect of "do not move or else I will use the taser" could not have been given.

26  Under Plaintiffs' version of events, this was not a quickly evolving situation that required split

27  second decision making.  It was feasible to give Barba a warning.

28         In terms of less intrusive methods available to the officers, the parties have not addressed

1   this consideration.  However, it appears that Milligan could have simply waited until Barba had

2   recovered his footing.  Prior to stumbling, Barba had been slowly complying with orders.  Under

3   Plaintiffs' version of events, there is nothing to suggest that Barba would not keep complying.

4        Finally, in terms of relative culpability, there appears to be more culpability with Milligan.

5   Plaintiffs' evidence shows that Barba was obeying the officers' orders.  He had been moving

6   slowly backwards with his hands behind his head over uneven terrain.  Barba was in the process of

7   turning, at the officers' instruction, when he lost his footing.  It is unclear what Barba could have

8   done differently to avoid being shot by the taser.

9        Under these circumstances, a reasonable jury could find excessive force.  Plaintiffs'

10   evidence shows that Barba was complying, lost his footing, and then was tased without warning,

11   even though he was not an immediate threat to the officers and was not resisting or evading

12   detention.   It is true that there was a substantial interest in detaining Barba under § 5150, but the

13   purpose of § 5150 is to obtain help, not stop crime, and none of the other relevant considerations

14   support Milligan's use of the taser.  Summary judgment on this issue is inappropriate.  See Bryan,

15   630 F.3d at 826-32.

16               b.    Second Taser Cycle

17        At the time of the second taser cycle, Barba was not an immediate threat to the officers.

18   Barba was on the ground and had already been shot with the taser darts and experienced one

19   electrical cycle.  Barba's left wrist was cuffed, Stephens had his weight on Barba's upper thigh,

20   and Barba was not moving.

21        Barba was not fleeing, but he may have been resisting Stephens.  Barba's right wrist was

22   under his body, and Stephens was unable to get to that wrist.  However, Barba was not attempting

23   to get up or actively fighting Stephens; he was simply lying on the ground and clinching his hand

24   underneath his body.  Importantly, the resistance lasted only seconds.  Stephens testified that he

25   was able to fully cuff Barba in less than 10 seconds from the time that he put on the first cuff.

26   Barba's resistance occurred after the first cuff was placed.  Therefore, Barba had been resisting

27   Stephens for less than 10 seconds before Milligan cycled the taser a second time.

28        Milligan gave no warning before he again cycled the taser.  There is no reason why a

12

1  warning could not have been given.  As indicated, Barba was lying on the ground.  Barba was not

2  attempting to get up and he was in no way attempting to overpower or physically fight Stephens.

3  Barba was lying on the ground and not moving, and the evidence suggests that he was generally

4  under Stephens's control.  Under Plaintiffs' version of events, Milligan did not need to make a

5  split second decision.

6          There has been no discussion about alternative methods to gain Barba's compliance.

7  However, it is unknown why warnings about using the taser again, or commands for Barba to let

8  his hand up from underneath him, could not have been given.  There is no evidence that the

9  officers ordered Barba to move his arm so that Stephens could finish cuffing.  Such a simple

10  command would be a less intrusive option to a second taser cycle.

11          In terms of relative culpability, it appears that Milligan is more culpable.  The Court will

12  assume that Barba would not have been tased a second time if he had not been clinching his right

13  hand underneath him.  However, Barba had been complying with the officers and had just been

14  tased when Milligan tased him a second time without warning.  The time between taser cycles was

15  very short, and Milligan gave no warning or additional commands.  It is not clear that Barba knew

16  or should have known that he was going to be tased a second time so quickly.

17          In light of the above, a reasonable jury could conclude that excessive force was used.

18  Plaintiffs' evidence shows that Barba was not moving, was not an immediate threat, and was not

19  fleeing.  No additional orders or warnings were given to Barba, even though it was feasible to do

20  so.  Although Barba was resisting Stephens, the resistance did not endanger anyone, was not

21  aggressive, did not last long, and was not contrary to any verbal orders.  A reasonable jury could

22  conclude that Barba's light resistance and the interest in detaining Barba under § 5150 were not

23  sufficient to justify the second taser cycle.  Summary judgment on this issue is not appropriate.

24  See Bryan, 630 F.3d at 826-32.

25                      b.      Qualified Immunity

26          In November 2010, the Ninth Circuit decided *Bryan v. MacPherson*.  In that case, the

27  Ninth Circuit held that a taser was an intermediate or medium, though not insignificant, quantum

28  of force.  See Bryan, 630 F.3d at 826.  Even though the *Bryan* court granted the officer involved

qualified immunity, it also held that the taser use was unconstitutional.  See id. at 832-33.  In

*Bryan*, the plaintiff was a youth who had not been given any warnings about the taser, was

suspected of committing misdemeanors, was emotionally disturbed, was not an immediate threat

to anyone, was not fleeing, was standing on pavement, and had been less than compliant with

officers' orders.  See id. at 826-32.

In this case, Barba appeared to be mentally disturbed, he was not actively evading the

officers, he posed no immediate threat to the officers, and he did not have the benefit of any

warnings before being tased.  It is true that Barba was not particularly responsive, and his

compliance was slow and only followed after the orders were repeated.  However, Barba

ultimately complied with what he was ordered to do.  Further, at the time of the second taser cycle,

Barba was lying on the ground, was not moving, was not an immediate threat, and was not fleeing,

and Milligan could have, but did not, give a warning.  Barba may have been resisting Stephens's

efforts to handcuff him, but as discussed above, the resistance displayed by Barba was minor and

lasted only seconds.

The key excessive force considerations in *Bryan* are very similar to the excessive force

considerations in this case.  *Bryan* was decided in November 2010, and the events of this case took

place in February 2011.  In light of *Bryan*, and viewing the evidence in the light most favorable to

Plaintiffs, a reasonable officer in Milligan's position would have known that both taser cycles

against Barba were unconstitutional.  See id. at 826-32.  Summary judgment is not appropriate.

**2.      Fourth Amendment -- False Arrest**

*Defendants' Argument*

Defendants argue that they had probable cause to detain Barba and take him into custody

pursuant to Welfare & Institutions Code § 5150.  The evidence shows that the officers had been

told that Barba was suicidal, and Barba's strange behavior towards the officers reinforced the

possibility that he was suicidal.  Barba's detention was therefore objectively reasonable.

*Plaintiffs' Opposition*

Plaintiffs do not address whether there was probable cause to detain Barba under Welfare

& Institutions Code § 5150.

1    *Legal Standard*

2         Section 5150 provides that "when any person, as a result of mental disorder, is a danger to

3    others, or to himself or herself, or gravely disabled, a peace officer . . . may, upon probable cause,

4    take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment,

5    evaluation, and crisis intervention, or placement for evaluation and treatment in a facility

6    designated by the county for evaluation and treatment and approved by the State Department of

7    Health Care . . . ." Cal. Welf. & Inst. Code § 5150(a).  The lawfulness of a detention under § 5150

8    is measured by Fourth Amendment standards.  See Bias v. Moynihan, 508 F.3d 1212, 1220 (9th

9    Cir. 2007); Maag v. Wessler, 960 F.2d 773, 775 (9th Cir. 1992).  "Probable cause exists under

10   § 5150 if facts are known to the officer that would lead a person of ordinary care and prudence to

11   believe, or to entertain a strong suspicion, that the person detained is mentally disordered and is a

12   danger to himself or herself."  Bias, 508 F.3d at 1220; People v. Triplett, 144 Cal.App.3d 283,

13   287-88 (1983).  "To justify the detention, the officer must point to specific and articulable facts

14   which, taken together with rational inferences from those facts, reasonably warrant his or her

15   belief or suspicion."  Bias, 508 F.3d at 1220; Triplett, 144 Cal.App.3d at 288.

16        *Discussion*

17        The undisputed evidence shows that the officers had probable cause to detain Barba for

18   treatment/intervention under § 5150.  The officers were aware that Barba was reported as being

19   suicidal and making suicidal statements.  The officers found Barba sitting alone in his truck at a

20   remote location in the early morning hours.  Barba never spoke to the officers.  For Barba to

21   perform any task, he generally had to be told multiple times over a PA system before he would

22   comply.  Barba was sweaty, had an odd look on his face during the encounter, and moved very

23   slowly.  Barba's behavior, appearance, and location appear entirely consistent with the reports of

24   suicidal ideation and of psychiatric distress.  Indeed, Plaintiffs acknowledge that Barba was

25   "uncommunicative and *obviously* suffering from some sort of mental condition."  Doc. No. 44 at

26   7:18-22 (emphasis added).  Given the totality of the circumstances, a person of ordinary care and

27   prudence would have believed that Barba had a mental disorder and was a danger to himself.  See

28   Bias, 508 F.3d at 1220; Triplett, 144 Cal.App.3d at 287-88.  Because the officers had probable

1  cause to take Barba into custody under § 5150, summary judgment in favor of the officers on the

2  false arrest claim is appropriate.  See id.

3     Alternatively, the information known to the officers about Barba being suicidal and

4  making suicidal threats, combined with Barba's appearance, location, and largely unresponsive

5  behavior, is sufficient for a reasonable officer in Stephens's and Milligan's position to conclude

6  that a 72-hour psychiatric detention/assessment under § 5150 was authorized.  Cf. Bias, 508 F.3d

7  at 1220.  Therefore, qualified immunity is appropriate.  See Saucier, 533 U.S. at 205-06; Johnson,

8  340 F.3d at 794; Lawrence v. United States, 340 F.3d 952, 956-957 (9th Cir. 2003).

9     **3.     Fourteenth Amendment – Interference With Familial Relationships**

10     *Defendants' Argument*

11     Defendants argue that Tye and Barbra Barba have no individual Fourteenth Amendment

12  claims.  Courts recognize a Fourteenth Amendment loss of familial relations claim in death cases,

13  but such a right has not been recognized in situations where family members have been briefly

14  separated from a detainee.  Recognition of such a right would open the floodgates to federal

15  litigation.  As recognized by the District of Idaho, the Ninth Circuit has never been called upon to

16  examine the type of overreaching claims made by Plaintiffs in this case, and other circuits are at

17  best split on the issue.

18     *Plaintiffs' Opposition*

19     Plaintiffs argue that they have viable Fourteenth Amendment claims.  Ninth Circuit case

20  law does not require a death before a person can bring suit for interference with familial relations.

21  The extent of any interference is only a damages issue.

22     *Legal Standards*

23     The Fourteenth Amendment protects the liberty interest in familial companionship and

24  association against unwarranted governmental interference.  See Crowe v. County of San Diego,

25  608 F.3d 406, 441 & n.23 (9th Cir. 2010); Lee v. City of Los Angeles, 250 F.3d 668, 685 (9th Cir.

26  2001); Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir. 1991).  The liberty interest in

27  familial companionship encompasses the familial relationship between spouses, see Morales v.

28  City of Delano, 852 F.Supp.2d 1253, 1273-74 (E.D. Cal. 2012); Pahle v. Colebrookdale Twp., 227

F.Supp.2d 361, 382-83 (E.D. Pa. 2002), and parents and children, including adult children.  See Curnow, 952 F.2d at 325; Ward v. San Jose, 967 F.2d 280, 283 (9th Cir. 1992); Smith v. City of Fontana, 818 F.2d 1411, 1419 (9th Cir. 1987); Rentz v. Spokane Cnty., 438 F.Supp.2d 1252, 1264-65 (E.D. Wash. 2006).

### *Discussion*

As the Court understands Defendants' arguments, the focus is on the extent of any interference with a familial relationship.  In particular, it appears that Defendants are arguing that because Barba was not killed, there is no Fourteenth Amendment violation.  The Court cannot agree with this argument.

The Ninth Circuit has recognized Fourteenth Amendment familial companionship claims in situations where no death occurred.  E.g. Crowe, 608 F.3d at 417; Lee, 250 F.3d at 676-78. *Crowe* and *Lee* foreclose Defendants' arguments.  It appears that while the *extent* of interference would relate to the issue of damages, the *existence* of interference would relate to whether a cause of action is available.  Cf. id.

Defendants' reliance on *Bach v. Idaho State Bd. of Med.*, 2011 U.S. Dist. LEXIS 80481 (D. Idaho July 22, 2011) is misplaced.  The issue in that opinion was whether the plaintiff had pled a cause of action under the *Iqbal* standard of pleading; there was no mention whatsoever of the Fourteenth Amendment.  To the extent that Defendants intended to cite the Court to *Bach v. Idaho State Bd. of Med.*, 2012 U.S. Dist. Lexis 7043 (D. Idaho Jan. 20, 2012), that case does mention the Fourteenth Amendment and familial companionship.  However, the discussion in *Bach* relates to whether a surviving husband had a Fourteenth Amendment familial companionship claim based on the death of his wife.  See Bach, 2012 U.S. Dist. LEXIS 7043 at *19.[7]  There was no discussion of whether a form of interference that amounted to something less than death could support a familial association claim.  See id.

In their reply memorandum, Defendants argue that Plaintiffs are pursuing a novel theory -- that an adult son and spouse could state a familial association claim when they call the police for

---

[7] The Court notes that it has recognized that spouses have a right to familial association that is protected by the Fourteenth Amendment.  See Morales, 852 F.Supp.2d at 1273-74.

1  help, but then complain because the police detain Barba for the very psychiatric evaluation that

2  they were unable to achieve on their own.[8]   This is a fair point.  The interference that is apparent

3  given the facts presented to the Court is Barba's detention pursuant to Welfare & Institutions Code

4  § 5150.  As discussed above, the officers had probable cause to detain and involuntarily admit

5  Barba under § 5150.  Because there was probable cause, a detention and a psychiatric hold of no

6  more than 72 hours would not seem to constitute "unwarranted interference."  See Crowe, 608

7  F.3d at 441 n.23.

8          Nevertheless, the Court does not believe that Defendants' argument was fairly presented as

9  part of the initial motion.  The Court will not grant summary judgment at this time because

10  Plaintiffs have not had a fair opportunity to address the issue.  Instead, the Court will order

11  Plaintiffs to show cause why summary judgment should not be granted on their Fourteenth

12  Amendment familial association claims.

13          **4.**      ***Monell* Liability**

14          Defendants state that Plaintiffs have agreed to voluntarily dismiss their *Monell* claims

15  against the City.  See Doc. No. 43 at 15:17-23.  Plaintiffs' opposition did not address *Monell*

16  liability in any way.  That is, Plaintiffs made no objections to Defendants' representation.  In the

17  absence of an objection from Plaintiffs, the Court will accept Defendants' representation and

18  dismiss Plaintiffs' fourth cause of action for *Monell* liability.

19          **5.**      **State Law Claims**

20          *Parties' Arguments*

21          Defendants argue that the state law claims mirror or stem from the federal claims.  Because

22  the federal law claims fail, the corresponding state law claims fail as well.  Plaintiffs do not

23  respond to this argument.

24          *Discussion*

25          Plaintiffs' fifth cause of action alleges state law false arrest.  As discussed above, the

26  officers had probable cause to detain and involuntarily admit Barba under Welfare & Institutions

27  Code § 5150.  If probable cause exists to arrest, there can be no "false arrest."  See Salazar v.

28
_____

[8] That Tye is an adult is immaterial.  See Ward, 967 F.2d at 283; Rentz, 438 F.Supp.2d at 1264-65.

1   Upland Police Dept., 116 Cal.App.4th 934, 947-48 (2004); Allen v. McCoy, 135 Cal.App. 500,

2   507-08 (1933).  Because probable cause existed to detain and admit Barba under § 5150, summary

3   judgment on this claim is appropriate.  See id.

4          As for the other state law claims, they all appear to stem from Milligan's use of a taser.  As

5   discussed above, the Court has determined that there are genuine disputed issues of material fact

6   with respect to Barba's Fourth Amendment claims regarding Milligan's use of the taser.  Because

7   summary judgment is improper as to the Fourth Amendment claims, summary judgment is

8   improper as to the related state law claims.

9          **6.**      **Officer Stephens**

10          Plaintiffs Complaint alleges the same causes of action against Stephens as it does against

11  Milligan.  Of particular note, the Complaint alleges that Stephens actually used a taser against

12  Barba.  See Complaint ¶ 10.  However, the evidence presented shows that only Milligan used a

13  taser.  Stephens's actions appear to be limited to giving Barba orders, placing Barba in handcuffs,

14  and later taking Barba to be admitted to a health facility under § 5150.  The Court has held that

15  Stephens had probable cause to detain and admit Barba under § 5150.  Because Stephens did not

16  actually use a taser on Barba, and given Stephens's actions as reflected in the evidence, it does not

17  appear that there are any viable claims, federal or state, against Stephens.

18          The Court is ordering Plaintiffs to show cause why summary judgment should not be

19  granted on their Fourteenth Amendment claims.  As part of the show cause response, Plaintiffs are

20  to show cause why summary judgment should not be granted in favor of Stephens on all

21  remaining claims alleged against him.

22

23          **CONCLUSION**

24          Defendants move for summary judgment on all clams alleged against them.  With respect

25  to the Fourth Amendment excessive force claim, there are genuine disputed issues of material fact.

26  Plaintiffs' evidence is sufficient to indicate that excessive force was used when Milligan twice

27  used his taser against Barba, and that a reasonable officer would have known that use of the taser

28  was unconstitutional.  Thus, summary judgment and qualified immunity will be denied.

As to the Fourth Amendment false arrest claim, the evidence shows that the officers had probable cause to detain Barba under Welfare & Institutions Code § 5150.  Alternatively, the facts indicate that even if probable cause was absent, the facts are such that the officers are entitled to qualified immunity.  Thus, summary judgment will be granted.

As to the Fourteenth Amendment familial interference claims, Defendants have not shown that Barba's adult son and wife are precluded from pursuing such claims as a matter of law.  Thus, summary judgment will be denied.

As to the *Monell* claims, Plaintiffs do not dispute that they have agreed to dismiss all such claims.  Thus, the Court will dismiss all *Monell* claims against the City.

As to the state law claims, the claims appear to be tied and relate to the Fourth Amendment claims.  Because summary judgment is being granted with respect to the Fourth Amendment false arrest claim, summary judgment will be granted as to the state false arrest claim.  Because summary judgment is otherwise being denied, summary judgment on all other state law claims also will be denied.

Finally, the evidence shows that probable cause existed to detain Barba under § 5150 and that Stephens did not use a taser against Barba.  These facts call into question the viability of both Plaintiffs' Fourteenth Amendment claims and the claims against Stephens.  Plaintiffs will be required to show cause in writing, including the submission of additional evidence, as to why summary judgment on the Fourteenth Amendment claims and on all claims against Stephens should not be granted.  Defendants will be given the opportunity to file a reply, which may include submission of additional evidence, to Plaintiffs' response.


**<u>ORDER</u>**

Accordingly, IT IS HEREBY ORDERED that:

1.    Plaintiffs' *Monell* claims are DISMISSED;

2.    Defendants' motion for summary judgment with respect to Plaintiffs' federal and state law false arrest claims is GRANTED;

3.    Defendants' motion for summary judgment is otherwise DENIED;

4.    By March 13, 2015, Plaintiff shall submit evidence and show cause in writing why the Court should not grant summary judgment in favor of Defendants on Plaintiffs' Fourteenth Amendment claims and on all claims alleged against Stephens;

5.    By March 24, 2015, Defendants may file a reply to Plaintiffs' response.


IT IS SO ORDERED.

Dated:   February 26, 2015                        _____

SENIOR  DISTRICT  JUDGE